# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

J. D., by his Next Friends,
MARK AND TAMMY DAVIS,

        Plaintiff,

v.                               CIVIL ACTION NO.  2:06-cv-00167

KANAWHA COUNTY BOARD OF EDUCATION,

        Defendant.

### MEMORANDUM OPINION AND ORDER

During an administrative hearing before the West Virginia Department of Education, J.D., by his parents Mark Davis and Tammy Davis ("parents"), alleged that the Board of Education of the County of Kanawha ("Board") violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400-1487 (West Supp. 2007), by failing to provide J.D. with a free appropriate public education based on the March 23, 2005, IEP. While the hearing officer found for the plaintiffs on some issues, he nevertheless determined that the IEP at issue in the case provided J.D. with a free appropriate public education. J.D. and his parents bring this action challenging that decision.

J.D. and his parents bring this civil action against the Board pursuant to 20 U.S.C. § 1415(i)(2).[1]  In this action, the plaintiffs assert that the defendant did not provide J.D. with a free appropriate public education as is required by the IDEA because 1) the special education services

---

[1] The plaintiffs also seek relief under § 1983, the Americans with Disabilities Education Act, and § 504 of the Rehabilitation Act. I have bifurcated this case and thus only address the IDEA claims in this Memorandum Opinion and Order.

offered by the Board were predetermined to suit the needs of the Board rather than being individualized for J.D., which is a procedural violation of the IDEA that caused substantive harm, 2) that the special education services were not reasonably calculated to enable J.D. educational benefit that is more than merely de minimus or trivial, and 3) that the education provided to J.D. was damaging without the proper services and supports in place. The plaintiffs seek specific services and meetings, funding, reimbursement, attorney's fees and costs, and compensatory and punitive damages.

Pending before the court is the defendant's motion for summary judgment on all counts in the plaintiffs' complaint. For the following reasons following, I **GRANT in part** the motion for summary judgment as it relates to the IDEA and **DENY in part** the motion for summary judgment as it relates to the other claims.

## I. The Individuals with Disabilities Education Act

### A. Purpose of the IDEA: A Free Appropriate Public Education

Congress enacted the IDEA to ensure that children with disabilities have access to a free appropriate public education ("FAPE"). *See* 20 U.S.C. § 1400(d)(1)(A). Congress has defined a FAPE as

> special education and related services that . . . (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate . . . education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

§ 1401(9).  The Supreme Court has explained that a FAPE "consists of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services

as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89 (1982).

**B. Implementation**

"A school provides a FAPE by creating an "individualized education program" ("IEP") for each child." *A.K. ex rel. J.K. v. Alexandria City School Bd.*, 484 F.3d 672, 675 (4th Cir. 2007) (citing § 1414(d)(1)(A)). The Court of Appeals recently explained the process behind the creation of an IEP:

> Before creating the IEP, the school district must conduct an initial evaluation to determine the student's eligibility and to identify his educational needs. *See* 20 U.S.C.A. § 1414(a)(1)(A)-(C). If the child is deemed eligible, an IEP is created by an "IEP Team" comprised of the child's parents, at least one of his regular teachers, at least one of his special education teachers, a school board representative, an individual who can interpret evaluation results (who may be either of the teachers or the school board representative), and, if appropriate, the child himself. *See id.* § 1414(d)(1)(B). The IEP must outline the student's then-current educational status, establish annual goals, and detail the special educational services and other aids that the child will be provided. *See id.* § 1414(d)(1)(A)(i). It also must provide, among other things, "the projected date for the beginning of the services and modifications . . . , and the anticipated frequency, location, and duration of those services and modifications." *Id.* § 1414(d)(1)(A)(i)(VII).

*Id.* An IEP is "substantively satisfactory" if it is reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 207. The Fourth Circuit explained that

> The appropriate education required, by the IDEA, however, should not be confused with the best possible education.... [O]nce a FAPE is offered, the school district need not offer additional educational services. That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.

*County School Bd. of Henrico County, Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 300 (4th Cir. 2005)

(quoting *MM ex rel. DM v. School Dist.,* 303 F.3d 523, 526-27 (4th Cir.2002) (citations, internal quotation marks, and alterations omitted)).  While a state need not provide the best education possible under the IDEA, the academic advancement must be more than trivial. *Hall ex rel. Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 636 (4th Cir.1985).

### C. Violations of the IDEA

Two types of violations of the IDEA exist: procedural violations and substantive violations.

#### 1. Substantive Violations.

Substantive harms occur when there is "an alleged deficiency" in what the school system offers as services to the child, thus preventing the child from receiving a FAPE. *See A.K.*,484 F.3d at 679 n.7. The consideration of whether the school offered an appropriate program also is substantive in nature. *See Knable ex rel. Knable v. Bexley City School Dist.* 238 F.3d 755, 767-70 (6th Cir. 2001).

#### 2. Procedural Violations.

A procedural defect can preclude a FAPE in a number of circumstances, such as if parents are afforded no participation or if schools fail to conduct IEP reviews on eligible children. *See, e.g.*, *Board of Education of County of Cabell v. Dienelt,* 843 F.2d 813 (4th Cir.1988). The denial of a parent's "opportunity to participate meaningfully" in the creation of the child's IEP is  a procedural violation of the IDEA. *See Knable ex rel. Knable v. Bexley City School Dist.* 238 F.3d 755, 767-70 (6th Cir. 2001).

A procedural violation must actually interfere with school district's provision of a FAPE to the child, however. *DiBuo ex rel. DiBuo v. Board of Educ. of Worcester County*, 309 F.3d 184, 190 (4th Cir. 2002). If a procedural defect exists, the court must "assess whether it resulted in the loss of

-4-

an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." *MM*, 303 F.3d at 533 (citing *Gadsby v. Grasmick,* 109 F.3d 940, 956 (4th Cir.1997)). A school district meets its obligations under the IDEA "if a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA." *Id.* at 534 (citing *Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982 (4th Cir.1990)). Thus, a procedural defect does not preclude the court from finding that a child received a FAPE. *Id.* at 534 n.15. If the parents were "fully advised of the proceedings" regarding their child, and "they were afforded an adequate opportunity to participate as a member of her IEP team," then the court may determine that the child still received an FAPE. *Id.*

### D. Enforcement of the IDEA

The Act establishes procedures through which children with disabilities and their parents can enforce the right to a FAPE if a violation of the IDEA occurs. § 1415. As part of the enforcement scheme, either a parent or a school board may request an impartial due process hearing. Any party aggrieved by the findings of a due process hearing has the right to bring a civil action in a federal district court without regard to the amount in controversy. § 1415(i)(2)(A). The statue further provides that a court adjudicating a civil action brought pursuant to the IDEA shall receive the records of the administrative proceedings, hear additional evidence at the request of a party, and grant the appropriate relief based on the preponderance of the evidence.§ 1415(i)(2)(B).  In the present case, neither party requested that I hear additional evidence. Thus, I will decide the case based on the administrative record before me.

The IDEA provides for a detailed and comprehensive administrative process, designed to promote the policies behind the statute. Although the statute creates a right to a civil action, a

potential litigant must exhaust the administrative scheme outlined in the statute as a prerequisite to filing a civil action.  *Board of Educ. v. Michael M.*, 95 F. Supp. 2d 600, 605 (S.D. W. Va. 2000) (Goodwin, J.) (quoting *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997)). The statute contemplates that decisions regarding educational policy will continue to be made at the local level and reviewed at the local or state level prior to any federal court involvement. This interpretation is supported by the Fourth Circuit's finding that the decisions in due process hearings conducted pursuant to the statute are entitled to be considered prima facie correct. *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000-01 (4th Cir. 1997).

**II. Analysis**

**A. Facts**

When J.D. was almost two, he was diagnosed with an autism disorder; when he was three, he was diagnosed with a pervasive developmental delay in the autism spectrum. Autism is a developmental disorder characterized by "significant deficiencies in communication skills, social interaction, and motor control." *Michael M.*, 95 F. Supp. 2d at 602.

On January 6, 2004, the Board's Multi-Disciplinary Evaluation team met, considered an extensive information sheet provided by the parents, and evaluated the student in accordance with the Batelle Developmental Inventory. On February 6, 2004, the Eligibility Committee determined that J.D. was eligible for special education in a preschool special needs class. In accordance with the IDEA, on February 6, 2006, an IEP was created for the student. J.D. began preschool in accordance with his IEP on February 17, 2004, at age 3. His preschool classroom was a LEAP classroom, which contained both children with developmental delays and their non-disabled peers. The LEAP

classroom is a highly visual classroom that is very structural and stresses repetition. In June 2004, J.D.'s father declined an invitation from the Board inviting him to place J.D. in a pilot program begun by the Board for young children with autism. In a letter, the father wrote that "he has made good progress [and] . . .he has not had the benefit of a full year of LEAP programming at [the school] and his mother and I are hesitant to remove him from what appears to be a good setting. . . ."

J.D. stayed in the LEAP classroom during the following 2004-2005 school year. In September 2004, the father wrote in a parent assessment that J.D. "while exhibiting some regression . . .during the first month after school, (he) has begun making good progress in the area of expressive language skills, prolonged and purposeful eye contact, and pointing."

In November 2004, J.D.'s parents began a home-based program involving "discrete trial training, applied behavioral analysis ("ABA"), and Lovaas methods of communication." (Compl. ¶ 18.). As I explained in *Michael M.*, under the Lovaas methodology, "private instructors use a discrete trial training ("DTT") method wherein the instructor breaks down complex items and concepts into their most basic components and builds upon those components to allow the child to approach more difficult concepts." *Board of Educ. of County of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 602 (S.D. W. Va. 2000).This home-based program was provided by therapists trained by the Center for Autism and Related Disorders (CARD).

In October 2004, J.D.'s parents requested an IEP meeting to discuss issues relating to J.D's current IEP and how "this home-based program could be incorporated into his school to be used along with his current LEAP program." (Compl. ¶ 21.) After a number of meetings between school system employees and parents, an IEP was finalized on March 23, 2005. The finalized IEP took into account many suggestions by the parents in the goals and objectives section of the IEP. Because the

services included in the IEP lacked a 1:1 aide or DTT therapy or ABA/Lovass therapy, J.D.'s parents were not satisfied with this IEP proposed by the Board. The plaintiffs contend that during the IEP writing process, J.D.'s parents "were not permitted to provide meaningful participation into the completion of the IEP and were not permitted at all to participate in the drafting of the services page of the IEP." (Compl. 27.). The parents never signed the IEP. They filed a request for a due process hearing on March 30, 2007.

In accordance with West Virginia's IDEA procedures, an evidentiary hearing was held before a state hearing officer who heard testimony from numerous witnesses and considered extensive documentary evidence. At the hearing a number of individuals testified on behalf of the parents, including Soo Min Cho, a senior clinical supervisor for the Center for Autism and Related Disorders (CARD), Betsy Atwater, a speech and language pathologist for Fayette County schools trained in the CARD program and who provided Discreet Trial Training to J.D. two times a week for three hours per session. (Tr. Vol. 1 at 231), Jerri Elliot, another of J.D.'s treatment providers, two doctors, Frank Locurto, a school psychologist for CARD, and J.D.'s parents. Testifying on behalf of the Board were, among others, Mary Ellen Davis, J.D.'s preschool teacher, Joyce Canter, the lead special education specialist in the Kanawha County Schools, Nancy Hindman, a teacher of children with autism, and Sandra Boggs, the Director of the Office of Special Education.

The hearing officer found the Board's witnesses were more credible than the plaintiffs' witnesses. (Dec.31-39.) He concluded that the March 23, 2005, IEP provided J.D. with a free appropriate public education and found that the IEP was reasonably calculated to confer meaningful educational benefit on the student.[2]

---

[2]The hearing officer also 1) remanded to the IEP team the issue of whether J.D. would have
(continued...)

-8-

The plaintiffs now bring this action. Their argument that the programs "were not reasonably calculated to enable J.D. educational benefit that is more than di minimus or trivial" is best classified as a substantive harm. *See A.K. ex rel. J.K. v. Alexandria City School Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007) (considering "an alleged deficiency" in what the school system was offering was a substantive harm under the IDEA).

The plaintiff also argues that the defendants violated the procedural requirements of the IDEA "when it made a predetermination of services." (Compl. ¶ 37.) The denial of a parent's "opportunity to participate meaningfully" is a procedural violation of the IDEA. *See Knable ex rel. Knable v. Bexley City School Dist.* 238 F.3d 755, 767-70 (6th Cir. 2001).

**B. Standard of review**

Under the IDEA, an aggrieved party may bring an action in federal court challenging the decision made in the state administrative proceedings. 20 U.S.C. § 1415(i)(2)(A). The parties contesting the hearing officer's decision bears the burden of proof . In this case, the parents bear the burden of proof that the IEP is "substantively deficient." *A.K.*, 484 F.3d at 680.

Whether an IEP is appropriate and thus sufficient to discharge a school board's obligations under the IDEA is a question of fact. *County School Bd. of Henrico County, Virginia v. Z.P. ex rel. R.P.,* 399 F.3d 298, 309 (4th Cir. 2005) (citing *DiBuo ex rel. DiBuo v. Board of Educ.,* 309 F.3d 184, 188 n. 8 (4th Cir.2002) and *Doyle,* 953 F.2d at 106). I must determine whether the IEP provided J.D. with a FAPE based on the "preponderance of the evidence," § 1415(i)(2)(B)(iii), and must

---

[2](...continued)
significantly regressed without extended school year services, 2) found that the school erred in implementing the March 23, 2005 IEP (but that this was merely a procedural harm from which no substantive harm occurred), 3) determined that the school must conduct an occupational therapy evaluation on J.D. and must hire an independent facilitator to facilitate IEP meetings, 4) ordered that the board provide J.D. with compensatory speech and language therapy.

"independently make factual findings regarding the appropriateness of the proposed IEP." *Henrico County*, 399 F.3d at 309. Still, I "should be reluctant indeed to second-guess the judgment of education professionals." *MM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 532 (4th Cir.2002) (quoting *Tice v. Botetourt County Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir.1990)). The Fourth Circuit explained that "the court's role in reviewing the administrative proceeding concerning IDEA 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'"*A.B. v. Lawson*, 354 F.3d 315, 325 (4th Cir. 2004) (citing *Rowley*, 458 U.S. at 206)). In *Tice*, the Court of Appeals held that "Neither the district court nor this court should disturb an IEP simply because we disagree with its content. . . . We wholeheartedly agree that once education authorities have made a professional judgment about the substantive content of a child's IEP, that judgment must be respected." 908 F.2d at 1207-08 (internal citations omitted). The Supreme Court has stated that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207.

When determining whether the IEP provides J.D. a FAPE, I must also give "due weight" to the state administrative proceeding. *Id.* at 206; *Doyle*, 953 F.2d at 103("Generally, in reviewing administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings.").

The Fourth Circuit has defined "due weight" to mean that "findings of fact by the hearing officers in IDEA cases must be considered prima facie correct." *Doyle*, 953 F.2d at 10; *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000-01 (4th Cir. 1997). Factual findings made during state administrative proceedings are "entitled to a presumption of correctness so long as the findings are 'regularly made'." *Henrico County*, 399 F.3d at 305 (citing *Doyle*, 953 F.2d at 105). In *Henrico*

*County*, the Fourth Circuit determined that findings are regularly made if they are "thorough, with many citations and references to the testimony of the . . . witnesses." *Id.* at 305 (finding that the hearing officer's decision was regularly made and reversing a district court that held that the hearing officer failed to adequately consider the testimony of three school board witnesses, relied too much on the parents' experts, and failed to give appropriate consideration to the basis for each witness' opinion).[3] "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" *Henrico County*, 399 F.3d at 305 (citing *Doyle*, 953 F.2d at 104). If a district court chooses not to follow administrative fact-findings, it must explain why it does not. *Id.* at 304.

Credibility determinations by an official who has seen and heard a witness testifying also receive due weight. *Doyle*, 953 F.2d at 104. In *Henrico County*, the court of appeals reversed and remanded the case to district court when the district court found witnesses credible that the hearing officer had previously discredited. The district court, in its opinion, stated that the "hearing officers decision did not adequately, if at all, consider the testimony of the school board's three expert witness," and that the hearing officer placed too much reliance on the parent's testimony. The Fourth Circuit reversed and remanded, noting that the evidence presented by the school board was simply not of a nature or quality that would "require the hearing officer to accept it over that of the plaintiff's witnesses." 399 F.3d at 306. Furthermore, the "the hearing officer's analysis and explanation for the

---

[3]In *Henrico County*, while the hearing officer did not find the school board's witnesses more credible than the parent's witnesses, the officer cited and referenced the school board's witnesses throughout the opinion. The Circuit court concluded, "it is thus clear that the officer did give careful consideration to the opinions of the school board's witnesses." Henrico at 305.

basis of his ruling made it clear he was not persuaded, and why he was not persuaded" by the school board's evidence. *Id.* at 306-07.

## C. Discussion

The essential conflict in this case is whether J.D. received a FAPE. In the defendant's motion for summary judgment, the defendants assert that the hearing officer correctly found that the March 23, 2005 IEP provided J.D. with a FAPE.[4] In the complaint, however, the plaintiffs assert that the defendant did not provide J.D. with a fair and appropriate public education as is required by the IDEA because 1) the special education services offered by the Board were predetermined to suit the needs of the Board rather than being individualized for this student, which is a procedural violation that caused substantive harm, 2) the special education services were not reasonably calculated to enable J.D. educational benefit that is more than mere de minimus or trivial, and 3) that the education provided to J.D. was damaging "without the proper services and supports in place."

After considering how much weight the hearing officer's decision should receive, I will consider whether the IEP was predetermined, then will address whether J.D. received a FAPE.

## 1. Hearing officer's decision.

I must first consider whether the hearing officer's decision that J.D. received a FAPE should receive due weight. The plaintiffs argue that the hearing officer's decision was not "regularly made," and thus I should not accord it due weight. The plaintiffs assert that the statements in the merits portion of the decision "are not accurately based on the record," include a number of false statements, and should not be considered prima facie correct.  (Pls.' Resp. 3.).

---

[4]As this case was bifucated between the IDEA claim and the other causes of action, I need not reach the defendant's other arguments regarding § 1983, the Americans with Disabilities Act, and § 504 of the Rehabilitation Act.

I **FIND** that the hearing officer's decision must receive due weight. The hearing officer cited testimony and evidence before him, his decision was thorough, and his decision was reached through "the accepted norm of a fact-finding process." *Henrico County*, 399 F.3d at 305. He prepared a detailed factual background based on the evidence and testimony before him, noting the process that the parents and school system had gone through to reach the point where the March 23, 2005, IEP was made. The officer stated that the IEP team members reviewed the documents provided by the parents as well. (Dec. 39).

He discussed in detail his reliance upon, as well as his rejection of, particular testimony and evidence. He cited the evidence before him, including parent letters and assessments, as well as the IEP at issue, when explaining why he determined that J.D. received a FAPE. He explained why he determined that J.D. received a FAPE, insofar as the "schools provided credible testimony that the methodology employed by the schools is well-suited to achieve the goals and objectives in the March 23, 2005 IEP."[5]

Much of his discussion focused upon the credibility determinations. As I have previously stated, credibility determinations by the hearing officer are entitled to due weight. Here, "the hearing officer's analysis and explanation for the basis of his ruling made it clear he was not persuaded, and why he was not persuaded" by the plaintiffs' witnesses. *Henrico County*, 399 F.3d at 306-07. The decision indicates that the hearing officer heard and considered extensive testimony from both the plaintiffs' and defendant's witnesses, as he cited witnesses from both parties and explained why he did or did not find each of them credible. (*See* Dec. 31-39.) The hearing officer spent approximately five pages detailing why the plaintiffs' witnesses were not credible and thus, why the defendant's

witnesses were more credible.  He cited inconsistencies in testimony, as well as bias by plaintiffs'
witnesses. When deciding not to deem J.D.'s father a credible witness, he noted that the father sent
a letter to the classroom teacher stating that J.D. "made lots of progress," yet then later claimed that
J.D. is not receiving a FAPE under the IEP at issue. (Dec. 33.)

A number of statements in the credibility determination that the plaintiffs argue are
inconsistent with the record are conclusory statements made by the hearing officer. For instance, the
hearing officer noted that the expert witnesses for the plaintiffs  testified "for the most part" regarding
what children with autism needed generally, as opposed to what J.D. needed. (Dec. 32). Though he
does not back up this conclusion with citations to the record or quotes from the witnesses, the record
supports this finding insofar as the experts, when not discussing their interactions with J.D., did note
generally what could advantage children with autism, rather than what would advantage J.D.
specifically.  The hearing officer redirected testimony a number of times to make sure that the witness
testified what was appropriate for J.D. rather than what was appropriate for another child with autism.
(*See, e.g.*, Tr. Vol. I at 207-209; Tr. Vol. II at 53.) While the plaintiffs' experts testified as to the
services that J.D. should receive, at least three experts were at times very general in their explanation
of types of services assist children with autism. (*See, e.g.*, Testimony of Drs. Megson & Poe, Trial
Vol. II at 112, 145). I **FIND** that the hearing officer's finding as to the testimony has support in the
record.

The hearing officer also explained why he found the experts for the Board to be credible, even
as the plaintiffs attacked one teacher witness's credibility for allegedly forging documents. The officer
determined that because the teacher admitted her mistake candidly, she was still credible.

-14-

The plaintiffs have not shown that the hearing officer's findings were not regularly made and therefore deserve no deference. Instead, the plaintiffs essentially argue the merits of the testimony of various witnesses and that the hearing officer was incorrect in according weight to certain testimony. While the evidence the parents presented was relevant, "it is not so compelling that [I] can conclude . . . that the hearing officer was required to accept it." *See Henrico County,* 399 F.3d at 306.

For these  reasons, I **FIND** the hearing officer's decision should receive due weight.

**2. Analysis**

The essential conflict in this case is whether J.D. received a FAPE.

1)Predetermination

Plaintiffs are correct in asserting that a predetermination of services is a procedural violation of the IDEA. The plaintiffs argue that the IEP team made a predetermination that J.D. "was not going to be provided a 1:1 aide, a continuation of his home-based program, ABA/discrete trial training, etc. without discussing options for his services page." (Pls' Resp. 9.) and that J.D. did not receive a FAPE. For their predetermination argument, the plaintiffs rely extensively on *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004).[6] *Deal* held that "predetermination amounted to a procedural violation of the IDEA" that "effectively deprived [the student's] parents of meaningful participation in the IEP process" and thus "the predetermination caused substantive harm and therefore deprived [the student] of a FAPE." *Id.* at 857. However, in the Fourth Circuit, a school district meets its obligations under the IDEA "if a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA." *MM* ex rel. *DM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 534 (4th Cir. 2002) (citing *Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982 (4th Cir.1990)).

---

[6]The plaintiffs, in their response brief, cite to footnotes 21 and 22. However, the footnotes in *Deal* only go to 18.

-15-

Thus, even if the decision were predetermined, if the child received a FAPE the school board met its obligations.

I **FIND** that in his decision, the hearing officer properly found that the March 23, 2005 IEP was not predetermined. The officers noted that the schools' special education specialist and other members of the IEP team read and considered the information brought to them by the parents, that the parents participated extensively in a number of IEP meetings, and that the IEP team made changes to the IEPs when the parents asked for certain changes. (Dec. 39-40.). As the hearing officer noted, the parents and their representatives participated in the IEP meetings and many of their suggestions were incorporated into J.D.'s IEP. The hearing officer noted that the team took breaks during the IEP meetings to "review and consider in detail the information brought by the parents, and the record reveals that many of the goals, objectives and performance levels suggested by the parents were substantially accepted and incorporated" into the IEP at issue. (Dec. 39.)  I **FIND** that like in *MM*, the student's parents had a "full opportunity to participate in the development " of the proposed IEP. *MM*, 303 F.3d at 534 -535.

I also **FIND** that the hearing officer correctly explained that the IEP Team met five times with the parents, but never discussed the services pages with the parents. The officer reasoned that this failure to discuss the services page with the parents did not qualify as predetermination because the parents "derailed the IEP process," and thus the team "never got to a thorough discussion of the issue of services." (Dec. 37). The hearing officer further found that the Board "had no policy of refusing certain methodologies" because a witness for the Board testified that "the IEP for the student herein included some components of [ABA]." (Dec. 39-40.)

-16-

The hearing officer further disposed of the plaintiffs' claim that because a draft IEP existed, the services were predetermined. The hearing officer reasoned that "if there were evidence that a school district had been inflexible and refused changes to a draft IEP," then this would be evidence toward predetermination. (Dec. 40). Here, however, the Board accepted many of the parents' suggestions.  The school system's choice not to include the suggested services that the parents proposed does not mean that the IEP was predetermined.

For these reasons, I **FIND** that the Board did not predetermine J.D.'s IEP and thus no procedural error occurred.

2) FAPE

The plaintiffs also argue that the IEP provides no educational benefit to J.D.  The plaintiffs argue that the Board was "unable to show exactly how he learns in the pre-school program" and that "they could not rebut and did not rebut any of the experts who testified as to how [J.D] learns based on his individual needs." The plaintiffs assert that J.D. learns by "breaking things down into discreet trials." (Pls.' Resp. 16).

I **FIND** that in his decision, the hearing officer properly found that the March 23, 2005 IEP gave J.D. a FAPE. As the hearing officer determined, the experts and other witnesses called by the school "testified credibly that the March 23, 2005, IEP was reasonably calculated to confer meaningful educational benefit upon the student and that the student could receive such educational benefit in his current preschool classroom without a one-to-one aide or any additional staff." The hearing officer, after explaining why he considered the parents' witnesses to be without credibility, noted that the witnesses called by the schools were more credible than the parents' witnesses.  While the hearing officer could have cited more to the record as to why he believed that J.D. received a FAPE from the

March 23, 2005 IEP, the evidence within record supports his conclusion. The IEP included many applicable goals and objectives. Staff members that the hearing officer found to be credible testified that J.D. made progress within the regular LEAP curriculum, without a one-on-one aide. (*See, e.g.*, Tr. Vol. 7 at 101.) Parental discontent over the services provided in the IEP, which is required to be reviewed and developed annually, is insufficient to overrule the opinions of the education professionals under the IDEA review process and does not preclude the court finding that a child received a FAPE.

There is no doubt that the individualized therapy that J.D. received from private providers assisted in his development. Still, while it may be desirable for each child to receive the best possible education available, that is not the standard placed upon the schools under the IDEA. Because credible testimony exists that J.D. made progress in the LEAP classroom, without a 1:1 assistant or DTT therapy, I must **FIND** by a preponderance of the evidence that the March 23, 2005 IEP provided J.D. with a FAPE. The educational benefit of the March 23, 2005 IEP was more than trivial or de minimus, and was calculated to give a benefit to J.D. Thus, the IEP meets the standard of *Rowley,* as articulated by the Supreme Court. *Rowley*, 458 U.S. at 207.

The court is aware of persuasive evidence that discrete trial training is extremely effective with certain individuals diagnosed with a disorder on the autism spectrum. While this court may not impose its view of preferable educational methods upon the Board, the court will be careful to ensure that a plan is individually designed for each student and that each student receives a fair appropriate public education. *See Rowley*, 458 U.S. at 207. The LEAP program, while found to offer benefits to J.D. under the March 23, 2006 IEP, cannot be presumed to be a one-size-fits-all solution for children on the autism spectrum.

The Board's witness, special education specialist Joyce Canter, stated in the hearing that preschool children like J.D. "change dramatically" in short amounts if time. (Tr. Vol. VII at 96:2). I remind the Board that in accordance with the IDEA, the IEP team must review a child's IEP at least yearly. 20 U.S.C. § 1414(d)(4)(A)(i). During this review, the team must address any lack of expected progress, the results of any reevaluation, information provided to or by the parents, the child's anticipated needs, and other matters. § 1414(d)(4)(A)(ii)(I-V).

### III. Conclusion

I **GRANT in part** the defendant's motion for summary judgment insofar as it relates to the plaintiffs' IDEA claim. **I DENY in part** the defendant's motion for summary judgment on all other counts, as it is premature.

The settlement hearing and trial scheduled for August 6 and 7, 2007, is **CANCELLED**. Parties are **DIRECTED** to consult and to submit to the court a proposed briefing schedule for the remaining claims within the next fourteen (14) days.  The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: August 3, 2007

Joseph R. Goodwin, Chief Judge

-19-